[Crim. No. 2266. In Bank.—April 19, 1920.]

## THE PEOPLE, Respondent, v. ONG MON FOO, Appellant.

[1] CRIMINAL LAW—MURDER—APPEAL—TRUTH OF EVIDENCE.—On appeal from a judgment of conviction of murder, the question of the truth of the evidence implicating the defendant is conclusively determined for all the purposes of the appeal by the verdict of the jury and the action of the trial court in denying the motion for a new trial.

[2] ID.—IDENTIFICATION OF DEFENDANT—INSTRUCTIONS.—In a prosecution for murder wherein the sole question in dispute was whether

the defendant was the man who did the killing, the refusal to give requested instructions directed particularly to the question of identification and to the testimony of the witnesses who swore that he was the guilty party, was not prejudicial error, where the jury was repeatedly instructed that they could not convict the defendant unless satisfied beyond all reasonable doubt by the evidence of his guilt.

[3] ID.—EVIDENCE—ACCUSATORY STATEMENTS—SILENCE OF DEFENDANT.—In the prosecution of a Chinese for the murder of a fellow-countryman, statements in the English language made by the deceased and his wife in the presence and hearing of the defendant when under arrest shortly after the shooting accusing him of the commission of the crime were admissible solely for the purpose of showing an admission on his part of the truth of the charge, where the defendant made no reply thereto and it appeared that he had sufficient understanding of the English language to appreciate the nature of the accusations.

[4] ID.—MISCONDUCT OF COUNSEL—IMPROPER STATEMENT OF DISTRICT ATTORNEY DURING CROSS-EXAMINATION OF WITNESS—INSTRUCTION—LACK OF PREJUDICE.—In such prosecution, the conduct of the district attorney in stating substantially to the court when objection was made to a question asked one of defendant's witnesses as to whether he was a member of a certain tong, that he would attempt to show by cross-examination that the witness was a member of the tong, that the deceased was ordered killed by such tong, and the witness delegated by the tong to testify for the defendant, was improper, but without prejudice, where the jury was instructed that statements of counsel did not constitute evidence.

[5] ID.—APPEAL—MISCONDUCT OF COUNSEL—ESSENTIALS.—Where any possible prejudicial effect of misconduct of counsel would be obviated by a proper admonitory instruction, formal assignment as misconduct and request for an instruction, are essential to a consideration of the matter in an appellate court.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial. Michael J. Roche, Judge. Affirmed.

The facts are stated in the opinion of the court.

Timothy Healy and Bert Schlesinger for Appellant.

U. S. Webb, Attorney-General, John H. Riordan, Deputy Attorney-General, and R. L. Chamberlain for Respondent.

ANGELLOTTI, C. J.—The defendant was convicted of murder of the first degree for the killing of one Wong Kim

Chong, and appeals from the judgment and from an order denying his motion for a new trial.

The deceased, who was a Chinese, was at work in his place of business, a small clothes dyeing and cleaning establishment on Clay Street near Stockton Street, San Francisco, between 5 and 6 o'clock P. M. on January 28, 1919, in the company of his wife and an employee, both Chinese, when a man, also Chinese, entered from the street and asked for a suit of clothes, giving his name as Mun Kee. The deceased instructed his employee to find the suit and turned again to his work at his ironing-table with his back to the man. The man then produced a pistol and fired one shot at the deceased, the bullet entering the abdomen from the back and passing through the stomach, Leaving his pistol on the floor he then fled. Deceased died February 6, 1919, from septic peritonitis resulting from the wound so inflicted. There is no dispute as to these matters. The killing of the deceased was a deliberate and premeditated murder, and the man who thus visited his place of business on January 28, 1919, fired the shot that inflicted the mortal wound and then fled therefrom, is guilty of this murder. The sole question in dispute on the trial was whether this defendant was that man. According to his story told on the witness-stand at the trial, the defendant was not in or about the vicinity of the store of the deceased on that day. He said that he had come to San Francisco from Oakland, where he resided, late that afternoon to see a Chinaman who was working at a place of business on Merchant Street, near Sansome Street; that he went to this place direct from the ferry landing at the foot of Market Street; that he there saw and talked with this man; that he ran from there to take a car at the corner of Clay and Sansome Streets to go to the ferry again, that in trying to get on a car in motion at that point going toward the ferry he fell and was hurt, and the car then stopping he succeeded in reaching it and getting aboard, and that he was taken from the car by the police officer. As to his visit to the place on Merchant Street near Sansome Street, he was corroborated by the Chinese whom he there saw. There was some other evidence tending to show that the person who fled from the place of business of deceased was not the defendant, and that this person ran across Clay Street and into Spofford Alley, where

he disappeared, instead of up Clay Street to Stockton and
back via Stockton Street, Sacramento Street, Waverly Place,
Clay Street and on down toward the city front, matters upon
which the identification of the defendant as the guilty person
are, in material part, based. At the time of the homicide
the influenza was epidemic in San Francisco and the assail-
ant had on an influenza mask, thus rendering identification
more difficult. There was no evidence whatever tending to
show any motive for the killing. On the other hand, the
wife and the employee of deceased positively identified the
defendant as the person who did the shooting, and another
witness, one Ellicott, a white man, identified him as a man
he saw in flight from Stockton Street down Sacramento
Street, pursued by the deceased for a block or so, and whom
he followed to the place of arrest. The defendant, who the
officers say was perspiring when arrested and apparently
had been running, was brought back by them to the place of
business of deceased within a very short time after the
shooting, and both deceased and his wife, in his presence and
hearing, declared him to be the man who had done the
shooting. [1] The evidence implicating defendant was
sufficient, if true, to sustain the conclusion that he committed
the murder, and, of course, the question of the truth of this
evidence is conclusively determined for all the purposes
of the appeal by the verdict of the jury and the action of
the trial court in denying the motion for a new trial.

It is urged that the trial court erred in refusing to give
two requested instructions directed particularly to the ques-
tion of the identification of the defendant as the person who
committed the crime, and the testimony of the witnesses who
swore that he was the one who did the shooting. One of
these instructions, after stating that to justify his convic-
tion his identity as the guilty person must be proved beyond
every reasonable doubt, told the jury substantially that they
were not bound to believe that a witness was able to identify
with certainty because he swore positively thereto, and that
they should not so believe if they were satisfied from the
circumstances proved that there was a reasonable doubt
whether he "was able to and did identify the defendant as
the guilty person," and that if they believed from the evidence
and the circumstances proved that there was a reasonable
doubt whether the witnesses might not be mistaken as to

identity, they would not be authorized to convict unless "the corroborating circumstances tending to establish his identity" are such as, with other testimony, produces a degree of certainty in the mind of the jury so great that they can say and feel that they have no reasonable doubt as to the identity of the defendant. The other was: "The court instructs the jury that before they can convict the defendant in this case it must appear beyond a reasonable doubt, that the defendant and not somebody else committed the offense charged in the indictment. It is not sufficient that the evidence shows that the defendant or somebody else committed the crime, nor that the probabilities are that the defendant and not somebody else committed the crime, unless these probabilities are so strong as to remove all reasonable doubt as to whether the defendant or someone else is the guilty party." The defendant was not entitled to an instruction directed specially to the credibility of the witnesses who identified the defendant as the assailant. The members of the jury were fully and repeatedly instructed that they were the sole judges of the weight of the evidence and the sole and exclusive judges of the credibility of the witnesses, and in view of the charge it is clear that they were most explicitly informed that they were not bound to accept as true the testimony of any witness upon any subject simply because it was positively given under oath, but that it was for them to consider all the evidence, giving to the testimony of each witness just such weight as in their judgment under all the circumstances it should be accorded, and that they could not convict the defendant unless satisfied beyond all reasonable doubt by the evidence of his guilt. In so far as any question of weight of evidence or credibility of witnesses was concerned the general instructions covered the ground as fully as defendant had any right to insist. It would have been entirely proper to instruct the jury in so many words, as requested in the first of these instructions, that to justify defendant's conviction, his identity as the guilty person must be proved beyond every reasonable doubt. However, it is impossible for us to imagine that, in view of the general instructions given, they could have thought otherwise. These instructions were clear and explicit to the effect that unless the guilt of the defendant was shown to the satisfaction of the jury beyond all reasonable doubt,

they must acquit him, and that if, after a full and dispassionate consideration of all the evidence in the case they entertained a reasonable doubt as to whether the defendant committed the crime, they must acquit him, and it does seem to us that in view of these instructions and under the circumstances of this case, no juror could be so stupid as to think the defendant could be held guilty unless he was in fact the identical person who fired the fatal shot. The jury were also told by the court in an instruction relative to defendant's defense that he was not at the place of business of deceased at the time of the commission of the crime, that "if, in view of all the evidence, the jury have a reasonable doubt as to whether the defendant was in some other place when the crime was committed, they should give the defendant the benefit of the doubt and find him ·not guilty." [2] We are satisfied that, regardless of any question of their correctness, prejudicial error cannot fairly be based on the refusal to give either of the requested instructions.

Over the objection of defendant, Officer Brady was allowed to testify to accusatory statements of deceased and his wife, made in the presence and hearing of defendant, when, immediately after being taken into custody, he was taken by the officers to the place of business of deceased, and to which he made no reply. According to Officer Brady, the deceased was lying on the floor, and, when confronted with defendant, said in the English language, pointing at defendant, "That man shot me," and defendant made no reply. Likewise, decedent's wife, upon his entering the place with defendant, spoke first in Chinese, and then in English, pointing at defendant, saying in the latter language, "That man shoot my husband," and defendant made no reply. The objection was that the testimony was immaterial, irrelevant, and incompetent, and substantially, that no foundation had been laid in that it had not been shown that the defendant understood the English language. While the defendant was then in the custody of the officers, he had not then been charged with the commission of any crime, and had been taken to the shop of deceased by the officers in order that they might ascertain what had happened there and whether any crime had been committed [3] While, of course, evidence of his then identification by the deceased or his wife as the person

who had shot deceased was not in and of itself admissible,
there being no claim that in so far as any statement of
deceased was concerned it was by way of a dying declara-
tion, the situation was such that any accusatory statement
of either made in the presence and hearing of defendant,
under such circumstances that it might fairly be inferred
that he heard and understood the nature of the charge, was
admissible *in connection with* evidence of conduct on his
part from which acknowledgment or acquiescence or admis-
sion of guilt might reasonably be implied, the only legitimate
purpose of such evidence being to show acquiescence or ad-
mission on the part of defendant in the face of the charge.
(See *People* v. *Byrne,* 160 Cal. 217, [116 Pac. 521] ; *People*
v. *Amaya,* 134 Cal. 531, [66 Pac. 794] ; *People* v. *Lapara,*
181 Cal. 66, [183 Pac. 545].)   Assuming that he understood
what was said and done, the circumstances were such that
the prosecution was entitled to prove that defendant re-
mained silent in the face of the accusatory statements, as
*tending* to show an admission of the truth of the charge,
the value of the testimony in this behalf being altogether a
question for the jury in view of all the circumstances.   The
authorities we have cited sustain this view, and sufficiently
state the reasons therefor.   In view of the decisions in this
state, the mere fact that the officers had him in custody did
not bar such evidence.   But it is necessarily true that such
evidence would not be admissible in the event that the de-
fendant, because of ignorance of the language used, or for
any other reason, did not understand the charge made
against him.   There is absolutely nothing in the record to
indicate that the defendant did not have sufficient knowledge
of the English language to understand the words spoken by
deceased and his wife, except the fact that when defendant
was examined as a witness he testified through an inter-
preter.   This is of little, if any, importance, as an inter-
preter might well be used notwithstanding defendant had
sufficient knowledge of the English language to understand
what was said by deceased and his wife.   The record also
shows that the wife, when called to testify, said she could not
speak English, and testified through an interpreter.   The
witness Ellicott testified that when he overtook defendant he
asked him, "what he did back there in Stockton Street," and

defendant answered with the word "Nothing." No effort at all was made on the trial to show that the defendant did not sufficiently understand English to know, when taken to the place of business of deceased after the homicide, that he was accused by deceased and his wife of having shot deceased, and no attempt to explain why he remained silent in the face of the accusation testified to have been made. As we have seen, the only affirmative evidence on this question was that of Ellicott to the effect that defendant did have sufficient knowledge of the English language to answer with the word "nothing," when asked in English what he had been doing. The record further shows that prior to the giving of Officer Brady's testimony, Officer Miles had testified to the same effect as did Officer Brady without objection being made to the evidence, and that after Officer Brady testified, Officer Wall gave substantially the same evidence without objection being made. So the matter of these accusatory statements and defendant's silence in the face thereof were before the jury from other witnesses than Brady, without objection, and without the slightest attempt at contradiction or explanation by defendant, who testified on the trial to a state of facts which, if true, completely exonerated him from the charge of having killed deceased. While it may be that when the objection to Brady's testimony suggested that it had not been shown that defendant understood the English language, the trial court should have inquired further into the matter before overruling the objection, if the court committed error in this regard it is not such error as would warrant a reversal, both for the reason that the same evidence was given by the other witnesses without objection and without attempt at contradiction or explanation, and because, in view of the record, we are fully warranted in assuming that the defendant did sufficiently understand the English language to appreciate the nature of the charge made against him by deceased and his wife. The situation in this regard is such that the provisions of section 4½ of article VI of the constitution are clearly applicable.

[4] In the opening brief it was claimed that the district attorney was guilty of such misconduct as requires a reversal, in stating substantially to the court when objection was made

to a question asked one of the defendant's witnesses, "You are a member, are you not, of the Sen Suey Ying?" that he would attempt to show by cross-examination that the witness was a member of the Sen Suey Ying Tong, that the deceased was ordered killed by such "tong," and the killing having been perpetrated the witness was delegated by the "tong" to testify for the defendant. The objection to the question asked the witness was overruled and the witness answered, "No." In response to other questions he testified that he was not directed by any member of the Suey Ying Tong to come to court to testify, that he had not discussed his proposed testimony with any member of such tong, and that his testimony was absolutely true. Of course, the district attorney had a right, on cross-examination, to inquire as to the interest of the witness and the reasons for his being in court as a witness, but we are somewhat at a loss to understand how he could reasonably have hoped to prove by this witness any of the matters set forth in his statement except, possibly, his membership in the Sen Suey Ying Tong. The statement was unnecessary, and, we think, improper. As to the particular question to which the objection had been interposed. viz., whether the witness was a member of the Sen Suey Ying, concerning which organization or its character there had not been a word of evidence, a simple statement that the question was merely preliminary would have sufficed. However, the district attorney did not assert as facts any of the matters embraced in his statement, simply saying that he would *attempt* by his cross-examination to prove them, and we think it must have been manifest to the jury, as it is to us, that the statement amounted to no more than an assertion that these things *might* be true. We do not see how the jury, instructed, as it was, that the case must be determined as to the facts solely on the evidence introduced, and that statements of counsel did not constitute evidence, could have been influenced thereby to the prejudice of defendant's rights. [5] Moreover, although defendant objected to the statements, they were not formally assigned as misconduct and an admonitory instruction asked, and in a case where, as here, any possible prejudicial effect would be obviated by a proper admonitory instruction, it is settled that such assignment and request are essential to a consid-

CLXXXII Cal.—45

eration of the matter in an appellate court. (See *People* v. *Babcock*, 160 Cal. 545, [117 Pac. 549].)

The judgment and order denying a new trial are affirmed.

Shaw, J., Wilbur, J., Lennon, J., Kerrigan, J., *pro tem.*, Lawlor, J., and Olney, J., concurred.